FILED
2021 Apr-09  AM 08:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **CLIFTON EPPS, JR.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:20-cv-00051-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Clifton Epps has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  The Commissioner denied Mr. Epps's claims for a period of disability and disability insurance benefits and supplemental security income.   After review, the Court reverses the Commissioner's decision.

### Procedural Background

Mr. Epps applied for a period of disability and disability insurance benefits and supplemental security income on January 5, 2017.  (Doc. 7-3, p. 11).  He alleged that his disability began December 31, 2016.  (Doc. 7-3, p. 11).  The Commissioner initially denied Mr. Epps's claims on February 24, 2017.  (Doc. 7-3, p. 11).  Mr.

Epps requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 7-3, p. 11).  The ALJ issued an unfavorable decision on February 12, 2019.  (Doc. 7-3, p. 19).  On November 19, 2019, the Appeals Council declined Mr. Epps's request for review, making the Commissioner's administrative decision final and proper for the Court's review.  (Doc. 7-3, p. 2); *See* 42 U.S.C. § 405(g).

## Standard of Review

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then the district court "must affirm even if the

2

evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## Statutory and Regulatory Framework

To be eligible for disability benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). A claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ must consider:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

**The Administrative Law Judge's Findings**

The ALJ found that Mr. Epps had not engaged in substantial gainful activity since December 31, 2016, the alleged onset date.  (Doc. 7-3, p. 4).  The ALJ determined that Mr. Epps suffered from the following severe impairments: degenerative disc disease; facial, neck, and bilateral upper extremity burn injuries; injury to left hand; and smoke inhalation.  (Doc. 7-3, p. 14).  Based on a review of the medical evidence, the ALJ concluded that Mr. Epps did not have an impairment

or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 7-3, p. 14).[1]

Considering Mr. Epps's impairments, the ALJ evaluated Mr. Epps's residual functional capacity and concluded that Mr. Epps had the RFC to perform:

> light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that [Mr. Epps] can never climb ladders, ropes, or scaffolds and can occasionally stoop, kneel, crouch, or crawl.  He can occasionally handle and finger with left upper extremity.  [Mr. Epps] can tolerate no exposure to extreme cold, but can tolerate occasional exposure to pulmonary irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals.  [Mr. Epps] can never be exposed to workplace hazards such as moving mechanical parts, and high exposed areas.

(Doc. 7-3, pp. 14–15).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone can do light work, . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no

---

[1] The regulations governing the types of evidence that a claimant may present in support of his application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction, 82 Fed. Reg. 15,132 (Mar. 27, 2017).  Because Mr. Epps filed his application for benefits before March 27, 2017, the new regulations, found at 20 C.F.R. §§ 416.913 and 416.920c, do not apply to his case. *See Morgan v. Comm'r of Soc. Sec.*, 760 Fed. Appx. 908, 911 n.2 (11th Cir. 2019).

more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Mr. Epps could not perform his past relevant work as a forklift truck operator.  (Doc. 7-3, p. 18).  Relying on testimony from a vocational expert, the ALJ found that jobs existed in the national economy that Mr. Epps could perform, including usher (*Dictionary of Occupational Titles* No. 344.677-014), counter clerk (*Dictionary of Occupational Titles* No. 249.366-010), and tanning clerk (*Dictionary of Occupational Titles* No. 359.567-014).  (Doc. 7-3, p. 18).  Accordingly, the ALJ determined that Mr. Epps was not under a disability, as defined in the Social Security Act, at any time from December 31, 2016 through the date of his decision.  (Doc. 7-3, p. 19).

## Analysis

Mr. Epps argues that the ALJ did not apply the pain standard properly. The Court agrees with respect to Mr. Epps's left arm, wrist, and hand but disagrees with respect to Mr. Epps's back and chest pain and lung capacity.

The pain standard "applies when a disability claimant attempts to establish disability through his . . . own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 918 (11th Cir. 2019). When relying on subjective reports of symptoms and pain to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not apply the three-part standard properly, then reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).   If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225; *Coley*, 771 Fed. Appx. at 918.   As a matter of law, the Commissioner must accept a claimant's testimony if the ALJ inadequately or improperly discredits the testimony.   *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When a claimant's credibility regarding his symptoms and pain is at issue, Social Security Regulation 16-3p applies.   Regulation 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence.   In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including

8

the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  An ALJ must explain the basis for findings relating to a claimant's description of symptoms and pain:

> [I]t is not sufficient … to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough … simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.   In evaluating a claimant's reported symptoms and pain, an ALJ must consider:

> (i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate … pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of … pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve … pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ should consider all three prongs of the pain standard to determine whether a claimant's symptoms and pain are disabling, but an ALJ also must consider "'whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities.'" *See Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018) (quoting SSR 16-3p). The ALJ must evaluate whether the statements regarding limiting effects of symptoms and pain are substantiated by objective medical evidence, and if they are not, then the ALJ must consider other evidence in the record to determine how the symptoms limit the claimant's work-related activities. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ stated that he considered Mr. Epps's "statements concerning the intensity, persistence and limiting effects of these symptoms" and found Mr. Epps's testimony "not entirely consistent with the medical evidence and other evidence in the record . . . ." (Doc. 7-3, p. 15). The ALJ considered three potential primary sources of limitation – Mr. Epps's left arm pain and restricted movement, Mr. Epps's back pain, and Mr. Epps's chest pain. Review of Mr. Epps's testimony, his medical records, and the ALJ's decision reveals that the ALJ failed to properly evaluate Mr. Epps's symptoms relating to his left arm pain and limited mobility.

10

*Mr. Epps's Administrative Hearing Testimony*

At the administrative hearing on October 16, 2018, Mr. Epps testified that he was 33 years old.  (Doc. 7-3, p. 41).  Due to an explosion at work in December of 2016, Mr. Epps suffered burns to his face and left arm.  (Doc. 7-3, pp. 45–46).  Mr. Epps stated he also suffered from back pain from a truck accident, pain with his left wrist from another work accident, and chest pain.  (Doc. 7-3, pp. 46–49, 51).  Mr. Epps had not worked since the 2016 explosion.  (Doc 7-3, p. 49).

With respect to residual limitations and pain relating to his burn injuries, Mr. Epps stated that the pain in his left wrist was an eight out of ten. (Doc. 7-3, p. 52). Mr. Epps received a referral to physical therapy to help with the limited range of motion in his left hand, fingers, and wrist, (Doc. 7-3, p. 52), but Mr. Epps explained that he could not afford to travel between his home in Eutaw, Alabama and UAB for physical therapy.  (Doc. 7-3, pp. 46-47).[2]  Mr. Epps then was directed to seek therapy at Green County Hospital, but Mr. Epps said that the therapist only worked with his skin.  The therapy did not help improve his wrist pain or limitations. (Doc. 7-3, p. 52).  Mr. Epps explained that he is right-handed.  (Doc. 7-3, p. 41).

---

[2] The Court takes judicial notice that Eutaw is approximately 90 miles from Birmingham.  FED. R. EVID. 201(b); *United States v. Chapman*, 692 Fed. Appx. 583, 584 (11th Cir. 2017) ("[C]ourts may take judicial notice of certain universally undisputed facts."); *Hubbard v. Comm'r of Soc. Sec.*, 348 Fed. Appx. 551, 553 n.1 (11th Cir. 2009) (courts make take judicial notice of facts in social security appeals).

In addition to the burn injuries to his left hand, Mr. Epps broke two of the fingers on his left hand in a workplace accident in 2013. (Doc. 7-3, pp. 48–49). Mr. Epps testified that cold weather bothered those fingers. (Doc. 7-3, p. 49).

Mr. Epps testified that after his accident in 2016, he could dress himself, but doing so took "quite a time" because he had "a hard time with [his] arm." (Doc 7-3, p. 49). He stated that he could use the touchscreen on his cellphone. (Doc. 7-3, p. 43). Mr. Epps testified that he could pick up "little sticks, and stuff," (Doc. 7-3, p. 50), but he could not grip items like a comb, a knife, or a fork with his left hand, and he could not make a fist with his left hand, (Doc. 7-3, pp. 52–53).

As for his back pain, Mr. Epps rated it a nine out of ten. He explained that he suffered from whiplash and neck pain following a truck accident that preceded his hearing by eight or nine years. (Doc. 7-3, p. 47). In August of 2018, Mr. Epps visited DCH Hospital and was diagnosed with a bulging disc. (Doc. 7-3, p. 54). Mr. Epps testified that he could not afford to see an orthopedist, as recommended at DCH. (Doc. 7-3, p. 54). Mr. Epps testified he had to lie down for four hours, or about half the time, between 8:00 a.m. and 5:00 p.m. due to his back pain. (Doc. 7-3, p. 54).

With respect to his chest pain, Mr. Epps stated that he has pain when he swallows. (Doc. 7-3, p. 51). He has not seen a pulmonologist. (Doc. 7-3, p. 51).

Mr. Epps lived with his mother and younger brother and helped around the house.  (Doc. 7-3, pp. 42, 49).  Mr. Epps testified he could prepare food for himself and go to the grocery store "depending on if it's a short distance." (Doc 7-3, p. 50). Mr. Epps had a driver's license but relied on his mother to get around because he did not own a vehicle.  (Doc. 7-3, p. 42).

### Mr. Epps's Medical Records

On December 30, 2016, Mr. Epps was treated in the Green County Health System Emergency Department for "head trauma; throat trauma; [a] laceration;" and burns.  (Doc. 7-8, pp. 39–40).  Mr. Epps was in "significant pain due to the burns, particularly the left hand [and] arm," and he suffered third degree burns to his left hand and forearm to his elbow, and second degree burns to his right hand, the right side of his face, the right side of his neck, and the right side of his chest.  (Doc. 7-8, p. 40).  After he arrived, Mr. Epps was intubated "to protect his airway."  (Doc. 7-8, p. 40).  An exam revealed that Mr. Epps had "unlabored respiration; lungs clear to auscultation bilaterally."  (Doc. 7-8, p. 40).  GCH transferred Mr. Epps by helicopter to the UAB Hospital burn unit.  (Doc. 7-8, p. 45).  Mr. Epps was sedated during the transport because "pain management was a significant issue."  (Doc. 7-8, p. 45).

After arriving at UAB, Mr. Epps was diagnosed with third degree burns on his left hand and forearm, second degree burns on his face, and acute respiratory failure.  (Doc. 7-8, pp. 55–56).  An examination of his lungs revealed no acute

disease, but his chest examination revealed "ill-defined patchy opacities in the left upper lung, nonspecific but could represent contusion in the setting of trauma. The lungs are otherwise clear." (Doc. 7-8, pp. 60, 97). UAB discharged Mr. Epps the following day and prescribed 100 milligrams of docusate and 10 milligrams of oxycodone for moderate (4-6) pain. (Doc. 7-8, p. 80).[3]

On January 6, 2017, Mr. Epps returned to the UAB ER complaining of chest pain when swallowing, breathing pain, and "worsening pain in his left arm" with continuing numbness in his left hand. (Doc. 7-8, p. 62). The oxycodone prescription did not help alleviate his chest and arm pain. (Doc. 7-8, p. 62). The trauma/burn consultant noted Mr. Epp's wounds were "healing appropriately" and recommended a chest x-ray for inhalation injury. (Doc 7-8. p. 67). The chest x-ray showed that Mr. Epps's lungs "appear[ed] clear. . . no acute disease is identified." (Doc 7-8, p. 64). The physician diagnosed Mr. Epps with acute chronic pain from his left arm burn and discharged him with a prescription for ten milligrams of oxycodone and a follow-up appointment with the burn clinic. (Doc. 7-8, p. 64).

---

[3]   DOCUSATE (ORAL/RECTAL), MICHIGAN MEDICINE, UNIVERSITY OF MICHIGAN, https://www.uofmhealth.org/health-library/d01021a1 (last visited Apr. 1, 2021) ("Docusate is a stool softener that makes bowel movements softer and easier to pass.").

OXYCODONE (ORAL ROUTE), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193 (last visited Apr. 1, 2021) ("Oxycodone is used to relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated.").

When he returned to the UAB burn clinic on January 10, 2017, Dr. Rue described Mr. Epps's wounds as having "healed nicely," and the pain in his left arm and hand as mild with a pain score of six. (Doc. 7-8, pp. 81–82). Though he found that the wounds on the surface of Mr. Epps's left arm and hand were healing, Dr. Rue found a deficit in Mr. Epps's range of motion in his upper left extremity. (Doc. 7-8, p. 83). Dr. Rue stated: "Pt has also not [been] doing any exercises at home. Thus pt has very limited [range of motion] in left hand/finger/wrists. Pt was educated and strongly encouraged that he needs outpatient rehab for the return of function of his left hand." (Doc. 7-8, p. 81). Dr. Rue prescribed ten milligrams of oxycodone and outpatient rehabilitation for Mr. Epps's left wrist for four weeks. (Doc. 7-8, pp. 81, 113).

One week later, Mr. Epps began physical therapy at Green County Nursing Home and Outpatient. (Doc. 7-8, p. 113). The physical therapy records indicate that his left wrist and hand pain were a seven out of ten, and he had a grip strength of 3+/5 on his left upper extremity. His left-side impairments impacted his ability to dress, bathe, and preform housekeeping activities. (Doc. 7-8, p. 113). The record indicates that Mr. Epps displayed a "decline in functional mobility" in his left hand and wrist. (Doc. 7-8, p. 113). His motor coordination was "moderately impaired." (Doc. 7-8, p. 113). The record states: "Without therapy patient at risk for contractures." (Doc. 7-8, p. 113). Contractures are a fixed tightening of muscle,

tendons, ligaments, or skin that prevents normal movement.  CONTRACTURE DEFORMITY, MOUNT SINAI, https://www.mountsinai.org/health-library/symptoms/contracture-deformity (last visited Apr. 7, 2021).  Mr. Epps used Medicaid to pay for his first therapy session.  (Doc. 7-8, p. 114).

A physical therapy Interim Progress Note dated January 31, 2017 indicated that Mr. Epps needed therapy for "Muscle weakness (generalized.)"  (Doc. 7-8, p. 116.  The therapist described Mr. Epps's left wrist flexion/extension as "good" but influenced by pain.  (Doc. 7-8, p. 116).  Mr. Epps's left muscle strength was 4/5.  The record noted no improvement in his left wrist flexion.  (Doc. 7-8, p. 116).

Mr. Epps did not complete physical therapy because he could not afford treatment.  (Doc. 7-8, p. 117).  The PT – Therapist Progress & Discharge Summary dated February 1, 2017 states that Mr. Epps's "Payer source changed," and he had not received treatment since the January 31 report.  His therapy goal for his left wrist was not met.  (Doc. 7-8, p. 117).  The plan to increase Mr. Epps's right shoulder strength "to decrease burden of care" was not met.  (Doc. 7-8, p. 117).  The discharge summary indicated that Mr. Epps had left wrist muscle strength of 4/5 "influenced by pain and weakness."  (Doc. 7-8, p. 117).

Records from Mr. Epps's visit to the GCH Physician's Clinic on January 21, 2017, reflect that Mr. Epps had moderate Type I Diabetes that was well-controlled through regular insulin, but neuropathy was noted as a complication of his diabetes.

16

(Doc. 7-8, p. 110).  Mr. Epps's physical examination revealed normal respiratory pattern and chest appearance.  (Doc. 7-8, pp. 109–10).  But when Mr. Epps returned on January 25, 2017 for a follow-up burn appointment, Dr. Gordon admitted him to the hospital because of a persistent cough.  (Doc. 7-8, p. 105).  Mr. Epps was taking 75 milligrams of Tamiflu for his cough symptoms and 800 milligrams of Ibuprofen for pain.  (Doc. 7-8, p. 104).[4]  Dr. Gordon diagnosed Mr. Epps with moderate and worsening "acute bronchitis," but noted that he was responsive to treatment.  (Doc. 7-8, p. 107).  Mr. Epps's medication treatment plan included "decongestants, opioid cough suppressants, oral corticosteroids, azithromycin, and clarithromycin."  (Doc. 7-8, p. 108).[5]

---

[4]   OSELTAMIVIR   (TAMIFLU),   MAYO   CLINIC,   https://www.mayoclinic.org/drugs-supplements/oseltamivir-oral-route/description/drg-20067586 (last visited Apr. 1, 2021) ("Oseltamivir [Tamiflu] belongs to the family of medicines called antivirals, which are used to treat infections caused by viruses.  Oseltamivir is used in the treatment of the infection caused by the flu virus (influenza A and influenza B . . . . Oseltamivir may reduce flu symptoms (weakness, headache, fever, cough, runny or stuffy nose, and sore through) by one day.  Oseltamivir is also used to prevent influenza infection if you have come into close contact with someone who has the flu.").

[5]   AZITHROMYCIN (ORAL/INJECTION), MICHIGAN MEDICINE, UNIVERSITY OF MICHIGAN, https://www.uofmhealth.org/health-library/d00091a1 (last visited Apr. 1, 2021), ("Azithromycin is used to treat many different types of infections caused by bacteria, including infections of the lungs, sinus, throat, tonsils, urinary tract, cervix, or genitals.").

CLARITHROMYCIN,   MICHIGAN   MEDICINE,   UNIVERSITY   OF   MICHIGAN, https://www.uofmhealth.org/health-library/d00097a1 (last visited Apr. 1, 2021) ("Clarithromycin is an antibiotic that is used to treat many different types of bacterial infections affecting the skin and respiratory system.").

On July 26, 2018, Mr. Epps went to the Northport Medical Center ER complaining of chest pain, cough, pain while swallowing, and pain in his left arm. (Doc. 7-8, p. 147).  He rated his chest pain an eight out of ten.  (Doc. 7-8, p. 147). His chest examination showed:  "[t]he lungs are clear. No pneumothorax or effusion. The cardiomediastinal silhouette is within normal limits."  (Doc. 7-8, p. 153).  Dr. Hwangpo treated Mr. Epps and discharged him with prescriptions for acetaminophen with codeine (Tylenol with Codeine #3 Tablet), ketorolac tromethamine, and omeprazole magnesium (Prilosec Otc).  (Doc. 7-8, p. 155).[6]

On July 31, 2018, Mr. Epps returned to the Northport Medical Center ER complaining of a worsening sore throat and a "burning" pain after eating and drinking.  (Doc 7-8, p. 139).  Examination reports showed "no acute cardiopulmonary disease radiographically" and noted "no acute disease or significant change since prior exam of 07/26/2018."  (Doc. 7-8, p. 142).  The

---

[6] TORADOL (KETOROLAC TROMETHAMINE), RXLIST, https://www.rxlist.com/toradol-drug.htm (last visited Apr. 1, 2021) ("Toradol (ketorolac tromethamine) is a nonsteroidal anti-inflammatory drug (NSAID) that is used to treat moderately severe pain and inflammation, usually after surgery. Toradol works by blocking the production of prostaglandins, compounds that cause pain, fever, and inflammation.").

OMEPRAZOLE MAGNESIUM ORAL (PRILOSEC OTC), WEBMD, https://www.webmd.com/drugs/2/drug-76794-2250/omeprazole-magnesium-oral/omeprazole-delayed-release-tablet-oral/details (last visited Apr. 1, 2021) ("Omeprazole is used to treat certain stomach and esophagus problems (such as acid reflux, ulcers).  It works by decreasing the amount of acid your stomach makes.  It relieves symptoms such as heartburn, difficulty swallowing, and persistent cough.  This medication helps heal acid damage to the stomach and esophagus, helps prevent ulcers, and may help prevent cancer of the esophagus.").

physician who treated Mr. Epps believed he had acid reflux and discharged Mr. Epps with a referral for the condition and a prescription for Protonix.  (Doc. 7-8, p. 144).[7]

Mr.  Epps visited the Northport Medical Center ER on August 24, 2018.  He was admitted to the hospital, complaining of a worsening back and neck pain, initially caused from a prior automobile accident, and numbness in his left foot.  (Doc. 7-8, pp. 120, 130).  Mr. Epps's family reported that his left foot went numb while he was driving and that his "back pain [had] never been worse."  (Doc. 7-8, p. 120).  Mr. Epps's family also reported Ibuprofen offered "some relief but the pain is back and worse."  (Doc. 7-8, p. 120).  Mr. Epps described the severity of his back pain as moderate with movement as an aggravating factor.  (Doc 7-8, pp. 120–21).  The MRI showed "no malalignment of the lumbar spine," but Mr. Epps had a mild broad-based bulging disc at the L4-L5 level that "could correlate with symptoms in the L5 nerve root distribution."  (Doc. 7-8, p. 133).  Mr. Epps's lungs were clear, but he had decreased range of motion in his neck and left spine.  (Doc. 7-8, p. 134).

---

[7]    PANTOPRAZOLE  (PROTONIX),  MAYO  CLINIC,  https://www.mayoclinic.org/drugs-supplements/pantoprazole-oral-route/side-effects/drg-20071434?p=1 (last visited Apr. 1, 2021) ("Pantoprazole is used to treat certain conditions in which there is too much acid in the stomach. It is used to treat erosive esophagitis or 'heartburn' caused by gastroesophageal reflux disease (GERD), a condition where the acid in the stomach washes back up into the esophagus.  This medicine may also be used to treat Zollinger-Ellison syndrome, a condition where the stomach produces too much acid.").

***The ALJ's Determination***

<u>Left Hand Restrictions</u>

As noted, the ALJ found that Mr. Epps's "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (Doc. 7-3, p. 15). The ALJ "acknowledge[d] that [Mr. Epps] sustained significant burns as a result of being injured in [the] December [2016] explosion," but found that "there is no evidence in the record to suggest that [Mr. Epps's] injuries consistently present with disability severity." (Doc. 7-3, pp. 15–16). He explained that "while the record shows that [Mr. Epps] sustained significant burns to his bilateral upper extremities, face, and neck, subsequent treatment records show that [his] burns and wounds healed quickly." (Doc. 7-3, p. 16; *see also* Doc. 7-3, p. 14 ("[T]he claimant has consistently produced normal skin examinations performed after January 10, 2017.")). It is true that Mr. Epps's surface injuries healed well, but Mr. Epps's restrictions relate to his muscle strength and ability to grip in his left arm. The medical records do not indicate that Mr. Epps regained his strength in his left arm or his ability to grip with his left hand following the 2016 explosion.

As to those restrictions, the ALJ stated: "Firstly, the record shows that the claimant failed to comply with upper extremity home exercises immediately following his injury, directly leading to upper extremity limitation." (Doc. 7-3, p.

16).  The ALJ stated that "there can be no finding of good cause as it relates to [Mr. Epps's] history of noncompliance.  This is especially noteworthy, as the January 10[,] 2017 treatment note indicated that [Mr. Epps's] 'very limited' left upper extremity range of motion was a direct result of his having done no home exercises immediately following his injury."  (Doc. 7-3, p. 16).  The ALJ's finding is mistaken factually and legally.

Factually, there is no evidence in the record that Mr. Epps was given exercises for his left arm, wrist, or hand immediately following his December 2016 burn injury.  His December 31, 2016 discharge summary contains no recommendation for home exercises.  (Doc. 7-8, p. 80).  During Mr. Epps's second visit to the UAB burn clinic on January 6, 2017, Mr. Epps reported left arm pain and numbness in his left hand, and his examining physician wrote "given the circumferential nature to his burns and his numb hand, concerned about compartment syndrome or decreased blood flow to the hand.  Will have trauma surgeon come down and evaluate patient." (Doc. 7-8, p. 86).  The trauma surgeon determined that it was safe to discharge Mr. Epps, and Mr. Epps was sent home with oxycodone for pain but no instructions to exercise his left hand or wrist.  (Doc. 7-8, p. 86).

On January 10, 2017, Mr. Epps first was instructed that he needed to begin exercise to keep his left hand and wrist strength from deteriorating. (Doc. 7-8, p. 81). It was at that appointment that Mr. Epps's treating examiner noted that Mr. Epps had not been doing exercises at home and that Mr. Epps had "very limited rom in left hand/fingers/wrists," causing the physician to prescribe outpatient rehabilitation. (Doc. 7-8, p. 81).[8]

Legally, the ALJ erred in beginning his analysis of Mr. Epps's left arm strength and movement restrictions with a discussion of Mr. Epps's alleged noncompliance with a prescribed course of treatment (which, in fact, was not prescribed until January 10, 2017). True, the Commissioner may deny benefits if the Commissioner determines that a claimant failed to follow a prescribed course of treatment and that the claimant's "ability to work would be restored if []he had followed the treatment." *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990) (citing *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1988)). "This finding must be supported by substantial evidence." *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (citing *Patterson v. Bowen*, 799 F.2d 1455, 1460 (11th Cir. 1986)). But the Commissioner may not deny benefits based on noncompliance with a prescribed course of treatment without first finding that the claimant is disabled.

---

[8] The record demonstrates that Mr. Epps stopped attending physical therapy on February 1, 2017 because he could not afford it. (Doc. 7-8, p. 117).

On October 2, 2018, the Social Security Administration published notice of Social Security Ruling 18-3p which "provides guidance about how [the Social Security Administration] appl[ies] our failure to follow prescribed treatment policy in disability and blindness claims under Titles II and XVI of the Social Security Act (Act)."  Social Security Ruling 18-3p, 2018 WL 4694327, at *49616 (Oct. 2, 2018). The ruling "rescinds and replaces SSR-82-59: 'Titles II and XVI: Failure to Follow Prescribed Treatment.'"  2018 WL 4694327, at *49617.

 Before the Commissioner may consider whether a claimant failed to follow prescribed treatment, the record must demonstrate that the claimant is otherwise entitled to disability benefits under Titles II or XVI of the Act; that there is evidence that the claimant's medical sources prescribed treatment for the medically determinable impairment upon which the disability finding is based, and that there is evidence that the individual did not follow the prescribed treatment.  2018 WL 4694327, at *49617.  The Commissioner must then make two assessments:  whether the prescribed treatment, if followed, would be expected to restore the claimant's ability to engaged in substantial gainful activity; and whether the claimant has good cause for not following the prescribed treatment.  2018 WL 4694327, at *49617.

An ALJ "only perform[s] the failure to follow prescribed treatment analysis . . . after [he] find[s] that a [claimant] is entitled to disability . . . benefits . . . regardless of whether the [claimant] followed the prescribed treatment.  [An ALJ] will not

23

determine whether an individual failed to follow prescribed treatment if [he] find[s] the [claimant] is not disabled . . . ."  2018 WL 4694327, at *49617.  Here, the ALJ improperly considered Mr. Epps's alleged noncompliance.  The ALJ did not find that Mr. Epps was disabled.  To the contrary, the ALJ stated that "even if [Mr. Epps's] noncompliance was not at issue, there is no evidence in the record to suggest that [Mr. Epps's] injuries consistently present with disabling severity."  (Doc. 7-3, p. 16).  Therefore, the ALJ's analysis of Mr. Epps's description of his pain and limitations concerning his left arm, wrist, and hand began in error.

Next the ALJ discounted Mr. Epps's pain and restriction testimony because Mr. Epps had "completely normal skin examinations since the [2016] injury" – as noted, a point largely irrelevant to Mr. Epps's left arm and left grip strength -- and because Dr. Skelton, a one-time examining consultant, found that Mr. Epps could lift and carry objects "weighing up to 50 pounds on an occasional basis."  (Doc. 7-3, p. 16; *see* Doc. 7-9, p. 3).  But Dr. Skelton also found that Mr. Epps could never reach or push/pull with his left hand, (Doc. 7-9, p. 5), and that Mr. Epps had severe restrictions in his left-hand dexterity and severe weakness in his left-hand grip strength.  (Doc. 7-9, p. 14).  Dr. Skelton found that while Mr. Epps could "oppose thumb to all fingers" on his right hand, he was "only able to oppose thumb to 2nd finger on left."  (Doc. 7-9, p. 16).  Moreover, after crediting Dr. Skelton's opinion regarding Mr. Epps's ability to lift and carry objects weighing up to 50 pounds, the

ALJ later assigned little weight to Dr. Skelton's opinion, in part because Dr. Skelton's finding regarding Mr. Epps's ability to lift and carry objects weighing up to 50 pounds was inconsistent with some of his (Dr. Skelton's) other findings.  (Doc. 7-3, p. 17).  The ALJ concluded that Dr. Skelton's opinions were "entitled to only little weight as they are generally not consistent with the record as a whole."  (Doc. 7-3, p. 17).  Thus, it appears that the ALJ cherry-picked the parts of Dr. Skelton's opinion that support a finding of "not disabled" and disregarded the rest.  *See, e.g.*, *Williams v. Saul*, No. 5:18-cv-01464-GMB, 2020 WL 733815, at *14 (N.D. Ala. Feb. 13, 2020) ("It is within the ALJ's discretion to discredit the opinion of [a physician] or to assign little weight to his opinions.  But it is error for the ALJ to have assigned little weight to [the] opinion overall while simultaneously relying heavily on his opinions and findings to concluded that [the claimant] is not disabled.  This type of cherry-picking is forbidden."); *Storey v. Berryhill*, 776 Fed. Appx. 628, 637 (11th Cir. 2019) ("The ALJ's selective inclusion of only 'normal' or negative examination results to support the ALJ's 'mild' characterization of [the claimant's] condition was not based on substantial evidence.").[9]

---

[9] It seems difficult to reconcile Dr. Skelton's opinion that Mr. Epps could carry up to 50 pounds with his opinion that Mr. Epps had severe restrictions in his left-hand dexterity and severe weakness in his left grip strength.  Perhaps Dr. Skelton meant that Mr. Epps could lift 50 pounds with his right arm.  Dr. Skelton found normal dexterity and normal grip strength in Mr. Epps's right arm.  (Doc. 7-9, p. 14).  Dr. Skelton did note at the end of his neurologic examination of Mr. Epps that he "question[ed] if [Mr. Epps was] really trying at times during the exam."  (Doc. 7-9, p. 16).  Perhaps that helps explain a finding of severe restrictions in grip strength accompanied by a finding of ability to lift and carry up to 50 pounds.

Finally, the ALJ found that Mr. Epps's "activities of daily living suggest less than consistently disabling severity" because "despite his severe limitation secondary to his left upper extremity injury," Mr. Epps testified that "he remains capable of preparing simple meals, putting on his own clothing, and going to the store." (Doc. 7-3, p. 17). The ALJ could not rely on these findings to conclude that Mr. Epps is not disabled. First, Mr. Epps acknowledged that he could put on his clothes but stated that it "takes quite a time," and he had "a hard time with my arm. You know, I can't do what I used to do, you know, after I got hurt, and stuff like that." (Doc. 7-3, p. 49). Second, "participation in everyday activities of short duration, such as housework or fishing" will not preclude a claimant from proving disability. *Lewis*, 125 F.3d at 1441. Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances . . . performs housework for herself and her husband, and accomplishes other light duties in the home" still can suffer from a severe impairment).

On the record in this case, it is difficult to say that these errors, in combination, are harmless. Though the ALJ indicated that he could make a finding of "not disabled" without considering Mr. Epps's compliance with a prescribed treatment,

the ALJ described Mr. Epps's noncompliance as "especially noteworthy," signaling that noncompliance played a role in his decision.  Moreover, the ALJ included in Mr. Epps's residual functional capacity the ability to "occasionally handle and finger with left upper extremity," but Mr. Epps's medical records do not support this limitation without a selective reading of Dr. Skelton's opinion.

The vocational expert's testimony regarding jobs that would be available to Mr. Epps at the light and sedentary levels if he could not use his left hand is not entirely clear.  With the RFC that the ALJ developed, the vocational expert identified three jobs that Mr. Epps could perform:  an usher (*Dictionary of Occupational Titles* No. 344.677-014), with 30,000 jobs available nationally; a counter clerk (*Dictionary of Occupational Titles* No. 249.366-010), with 20,000 jobs available nationally; and a tanning salon attendant (*Dictionary of Occupational Titles* No. 359.567-014), with 18,000 jobs available nationally.  (Doc. 7-3, p. 59).  Mr. Epps's counsel asked the VE to assume the same individual "but instead of occasionally using his left upper extremity, could never use the left upper extremity, would that change your answer any?  Non-dominant hand."  (Doc. 7-3, p. 60).  The VE testified that "would reduce the numbers" but the individual could still perform the usher and tanning salon attendant positions.  (Doc. 7-3, p. 60).  And if an individual was limited to sedentary work but had no use of the left non-dominant hand, the VE testified that this individual could perform work as a surveillance system monitor (*Dictionary of*

27

*Occupational Titles* No. 379.367-010), of which 10,000 jobs exist in the national economy.  (Doc. 7-3, p. 61).

The Court cannot determine whether the ALJ would or should have reached different results at steps three, four, and five of the sequential analysis in the absence of the errors discussed above.[10]  Therefore, remand to the Commissioner is proper.

Back Pain

Mr. Epps argues that "[t]he ALJ's approach to [Mr.] Epps's back pain suggests a selective reading of the medical records."  (Doc. 12, p. 12).  "In essence the ALJ found [Mr.] Epps's complaints about the limitation in his back and Dr. Skelton's ROM limitations to be lacking medical support."  (Doc. 12, p. 12).  Mr. Epps says "[t]he main medical records supporting [his] back complaints are from his August 2018 visit to DCH."  (Doc. 12, p. 12).

On August 24, 2018, Mr. Epps displayed "decreased ROM to neck, L spine, TTP."  (Doc. 7-8, p. 134).  An MRI taken the same day showed:

> Bulging disc causes mild thecal sac compression and lateral recess narrowing, left slightly greater than right.  Bulging disc appears to at least contact the L5 nerve root sheaths bilaterally.  Any actual impingement would be somewhat more equivocal.  Could correlate with other symptoms in the L5 nerve root distribution.

---

[10] With respect to step three, substantial evidence supports the ALJ's finding that Mr. Epps does not meet the section 8.08 listing for burns of the skin, but the Court does not know whether another listing may address injuries that restrict an applicant's ability to grip with a non-dominant hand. The Court expresses no opinion about potential findings at step three.

(Doc. 7-8, p. 137).  The MRI also showed that "[t]here is no malalignment of the lumbar spine."  (Doc. 7-8, p. 136).

The ALJ explained that Mr. Epps's "lumbar degenerative disc disease has failed to consistently present with disabling restriction since December 31, 2016." (Doc. 7-3, p. 16).  The ALJ noted that "[d]espite reportedly experiencing lower back pain since approximately 2009, [Mr. Epps] has consistently produced normal musculoskeletal and neurological examinations throughout the record."  (Doc. 7-3, p. 16).  In the August 24, 2018 MRI report, the ALJ pointed out "the severity of the bulge was described as mild, and was said to create no more than mild thecal sac compression."  (Doc. 7-3, p. 16) (citing Doc. 7-8, pp. 136–37).

While considering Mr. Epps's disc bulge and the August 2018 hospital visit for his back pain, the ALJ included Mr. Epps's degenerative disc disease as a severe impairment and limited his RFC to "never climb ladders, ropes or scaffolds and can occasionally stoop, kneel, crouch, or crawl."  (Doc. 7-3, p. 14).  The ALJ based his opinion about Mr. Epps's back limitations on substantial evidence because the medical records show only mild damage to Mr. Epps's back and a single isolated treatment for back pain in August 2018.

<u>Chest Pain and Lung Function</u>

Mr. Epps argues that the ALJ "improperly minimize[d] [his] inhalation injury" and that the ALJ's finding that Mr. Epps "consistently produced normal respiratory or lung examinations throughout the record" is not supported by substantial evidence.  (Doc. 12, p. 10) (citing Doc. 7-3, p. 17).  The medical record, viewed in its entirety, contains substantial evidence to support the ALJ's findings regarding Mr. Epps's lung function and chest pain.

When Mr. Epps first arrived at UAB Hospital on December 30, 2016, the trauma team x-rayed his lungs.  (Doc. 7-8, p. 97).  The x-ray showed "ill-defined patchy opacities in the left upper lung, nonspecific but could represent contusion in the setting of trauma.  The lungs are otherwise clear.  No pneumothorax or pleural effusion.  No acute osseous abnormality."  (Doc. 7-8, p. 97).  During his January 6, 2017 follow-up appointment, Mr. Epps's treatment notes show that he had "no shortness of breath" and "no cough" and that his "[l]ungs are clear to auscultation, respirations are non-labored, breath sounds are equal."  (Doc. 7-8, pp. 62–63).  X-rays taken during that appointment showed that his "lungs appear clear.  No acute [] disease is identified."  (Doc. 7-8, p. 64).

On January 25, 2017, Dr. Michael Gordon treated Mr. Epps at the GCH Physicians Clinic.  (Doc. 7-8, p. 106).  Mr. Epps had a "productive cough" but a review of Mr. Epps's respiratory system showed no damage.  (Doc. 7-8, p. 106).

Mr. Epps had a "normal respiratory pattern," and Dr. Gordon diagnosed Mr. Epps with acute bronchitis. (Doc. 7-8, pp. 106–07).

During a July 31, 2018 visit to DCH Northport Medical Center, Mr. Epps complained of a cough, sore throat, and shortness of breath. (Doc. 7-8, p. 139). He said the pain was "worse after eating/drinking and describes it as 'burning.'" (Doc. 7-8, p. 139). The medical record shows Mr. Epps reported that "burns from fire 2 years ago messed up lungs." (Doc. 7-8, p. 139). Mr. Epps was not in respiratory distress and had "[n]ormal breath sounds bilaterally." (Doc. 7-8, p. 141). X-rays of his chest showed that his "[l]ungs appear essentially clear radiographically. Trachea midline. No acute disease or significant change since prior exam of 07/26/2018." (Doc. 7-8, p. 142).

On August 24, 2018, Mr. Epps returned to DCH Northport Medical Center complaining of back pain, neck pain, and left foot numbness. (Doc. 7-8, p. 130). His treatments notes show he had no cough. (Doc. 7-8, p. 131). His lungs were "[c]lear to auscultation bilaterally." (Doc. 7-8, p. 134).

The ALJ included Mr. Epps's smoke inhalation as a severe impairment and limited Mr. Epps's RFC to "occasional exposure to pulmonary irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals." (Doc. 7-3, pp. 14–15). The ALJ explained that "the record . . . fails to show any evidence of consistently disabling pulmonary impairment since the alleged onset date." (Doc.

7-3, p. 17).  The medical records do show that Mr. Epps suffered acute respiratory failure when he was admitted to UAB Hospital immediately following the explosion. (Doc. 7-8, p. 56).  But the rest of the medical records do not indicate long-term damage to Mr. Epps's pulmonary capacity, and the ALJ properly based his opinion on this substantial evidence.

## Conclusion

For the reasons discussed above, the Court remands Mr. Epps's case to the Commissioner for further proceedings.

**DONE** and **ORDERED** this April 8, 2021.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE